**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 12-22-GF-BMM |
| Plaintiff/Respondent, | |
| vs. | **ORDER DENYING SOME CLAIMS** |
| ADRIEN JOHN MATUCK, | |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant Adrien John Matuck's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Matuck is a federal prisoner proceeding pro se.

## I. Preliminary Review

Before the United States answers the motion, the Court must decide whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional

error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). The Court possesses a duty to "eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

A grand jury indicted Matuck on one count of first-degree murder, and, in the alternative, one count of second-degree murder, both violations of 18 U.S.C. § 1111(a). The indictment alleged that Matuck killed Raymond Brown on or about August 7, 2011, and asserted jurisdiction under the Major Crimes Act, 18 U.S.C. § 1153(a). *See* Indictment (Doc. 7) at 22.

Matuck filed motions to suppress his August 7, 2011, statement to law enforcement officers and to exclude evidence of his Marine Corps training, noticed under Federal Rule of Evidence 404(b). The Court denied both motions. *See* Notice of Other Acts Evid. (Doc. 27); Mots. (Docs. 32, 34); Order (Doc. 46).

The parties stipulated before trial that "Adrien John Matuck is an Indian person." Stipulation (Doc. 79) at 2 ¶ 1.

Trial commenced on September 4, 2012. After two days of testimony, the

jury deliberated for four hours, including an overnight recess. The jury convicted Matuck of first-degree murder. Minutes (Docs. 89, 91, 92); Verdict (Doc. 100).

Gallagher and Arvanetes withdrew from representation after trial. Palmer Hoovestal was appointed in their place. Hoovestal filed a motion for new trial based on Matuck's relation of his own account of Brown's death. Hoovestal's written offer of proof stated that "Matuck did not disclose these events to his previous counsel or to law enforcement out of fear of retaliation by John Whiteman." Whiteman testified as a witness for the government. *See* Br. in Supp. (Doc. 113) at 4. The Court denied the motion because the evidence set forth in the offer of proof was not "newly discovered." *See* Order (Doc. 124) at 2.

The Court sentenced Matuck to life in prison. If Matuck is released, he will serve a five-year term of supervised release. *See* 18 U.S.C. § 1111(b)(1); Judgment (Doc. 116) at 2-3.

Matuck appealed the denial of his motion for new trial and the sufficiency of the evidence proving his Indian status. The Ninth Circuit rejected his claims and affirmed his conviction on March 16, 2016. *See* Mem. (Doc. 142) at 2-3, *United States v. Matuck*, No. 13-30004 (9th Cir. Mar. 16, 2016).

Matuck's conviction became final on June 14, 2016. He timely filed his § 2255 motion on June 13, 2017. *See* 28 U.S.C. § 2255(f)(1); *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012); *see also* Mot. § 2255 (Doc. 146) at 6 Decl. ¶ C; *Houston*

*v. Lack*, 487 U.S. 266, 276 (1988).

### III. Claims and Analysis

All of Matuck's claims allege, at least in part, that trial and/or appellate counsel provided ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984) governs the claims. *See also Smith v. Robbins*, 528 U.S. 259, 285 (2000). At this stage of the proceedings, Matuck must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

#### A. Indian Status

The indictment invoked jurisdiction under the Indian Major Crimes Act, 18 U.S.C. § 1153(a). Section 1153 confers federal jurisdiction over certain offenses, including first- and second-degree murder, committed in "Indian country," *see id.* § 1151, by "[a]ny Indian," *id.* § 1153(a). The United States had to prove, beyond reasonable doubt, that Matuck was an Indian. *See United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009).

#### 1. Ex Post Facto Violation

Matuck claims he was convicted under an *ex post facto* application of controlling law and that appellate counsel provided ineffective assistance of counsel when he failed to present this argument. *See* Mot. § 2255 (Doc. 146) at 4 ¶¶ 5A, 5B; *id.* at 8-13, 32. In affirming Matuck's conviction, the Ninth Circuit applied *United States v. Zepeda*, 792 F.3d 1103, 1115-16 (9th Cir. 2015) (en banc). *See* Mem. (Doc. 142) at 2, *United States v. Matuck*, No. 13-30004 (9th Cir. Mar. 16, 2016). The Ninth Circuit decided *Zepeda* nearly four years after Brown's murder.

The *Ex Post Facto* Clause, *see* U.S. Const. art. I, § 9, cl. 3, prohibits four types of statutory laws or rules, *see Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (Chase, J.)). The *Ex Post Facto* Clause applies to Congress, not to the courts. A new judicial decision generally applies to acts committed before its issuance unless application of the new decision would deprive, in effect, the defendant of fair notice of what conduct is prohibited or is required of him by "attaching criminal penalties to what previously had been innocent conduct." *See, e.g.*, *Bouie v. City of Columbia*, 378 U.S. 347, 355 (1964); *Douglas v. Buder*, 412 U.S. 430, 432 (1973). Nothing protects Matuck against prejudice from judicial decisions made after he committed the crime. *See generally Rogers*, 532 U.S. at 460-62.

Matuck claims the Ninth Circuit's decision in *Zepeda* "alter[ed] the legal

rules of evidence" and allowed conviction based on "less, or different, testimony, than the law required at the time of the commission of the offense." *Rogers*, 532 U.S. at 456 (quoting *Calder*, 3 U.S. at 390). *Zepeda* in fact, did make it easier for the United States to establish federal jurisdiction under 18 U.S.C. § 1153. The new interpretation no longer required the government to prove a defendant's Indian blood came from a federally recognized tribe. *See* 792 F.3d at 1113. Courts possess "substantial leeway," however, to make such decisions and to apply them to past conduct. *See Rogers*, 532 U.S. at 461-62.

The Ninth Circuit's decision in *Zepeda* altered the legal elements of Indian status and the evidence appropriate to establish it. This revision did not deprive Matuck of due process. He had fair notice, before he acted, that intentionally killing someone would subject him to criminal prosecution and punishment. Matuck's *ex post facto* claim is denied.

## 2. Sufficient Evidence and Ineffective Assistance of Counsel

With liberal construction,[1] Matuck can also be understood to allege that the United States failed to prove that he had Indian blood traceable to a federally recognized tribe, and that counsel provided ineffective assistance of counsel for

---

[1] Courts are required to construe self-represented prisoners' pleadings liberally. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Rishor v. Ferguson*, 822 F.3d 482, 495 (9th Cir. 2016); *Butler v. Long*, 752 F.3d 1177, 1180 (9th Cir. 2014); *Zichko v. Idaho*, 247 F.3d 1015, 1020-21 (9th Cir. 2001). Even with liberal construction, Matuck does not challenge the sufficiency of the evidence or counsel's performance with respect to the second prong of the *Maggi* test. *See* Mot. § 2255 at 9-13; *see also infra* at 7. It will not be addressed.

failing to argue. *See, e.g.*, Mot. § 2255 at 10, 12. This claim depends on the law in effect at the time of trial—the law Matuck believes was more favorable to him. *See Strickland*, 466 U.S. at 689 (requiring evaluation of counsel's decisions "from counsel's perspective at the time"). The law does not support this sort of claim. *See Lockhart v. Fretwell*, 506 U.S. 364, 370-72 (1993). It further appears that the outcome of his case would not have been different even if counsel had raised this issue on appeal.

To establish federal jurisdiction over Matuck's case, the United States had to prove at trial that Matuck was an Indian person. *See* 4 Trial Tr. (Doc. 128) at 550:17, 552:12; *see also* Def. Proposed Jury Instrs. (Doc. 69-1) at 1, 3, 8. No statute defines who counts as an "Indian person." Courts have developed the criteria. At the time of Matuck's trial, the Ninth Circuit's "Indian person" test required the United States to prove the following elements:

> (1)  the defendant had a quantum of Indian blood traceable to a federally recognized tribe; and
>
> (2)  the defendant was a member of, or was affiliated with, a federally recognized tribe.

*See United States v. Maggi*, 598 F.3d 1073, 1080-81 (9th Cir. 2010); *see also United States v. Bruce*, 394 F.3d 1215, 1223-24 (9th Cir. 2005).

Before trial, defense counsel and the United States stipulated that "Adrien John Matuck is an Indian person." Stipulation (Doc. 79) at 2 ¶ 1; *see also* 1 Trial

Tr. (Doc. 125) at 3:7-9 (showing Matuck was present); *id.* at 3:22. Matuck's

stipulation to the jurisdictional element relieved the United States of the need to

introduce evidence on either prong of the *Maggi* test. *See, e.g.*, 1 Trial Tr. (Doc.

125) at 68:9-11, 71:19-23; 4 Trial Tr. at 548:22-25. The United States relied on

the stipulation in closing argument. *See* 4 Trial Tr. at 574:11-13.

 Counsel frequently stipulate to facts, even jurisdictional facts, when no

realistic hope exists of contesting them. *See, e.g.*, *United States v. Benedict*, 855

F.3d 880, 887-88 (8th Cir. 2017); *United States v. Crowe*, 735 F.3d 1229, 1243-45

(10th Cir. 2013); *United States v. Celaj*, 649 F.3d 162, 168-70 (2d Cir. 2011);

*United States v. Gullett*, 75 F.3d 941, 947 (4th Cir. 1996); *see also United States v.

Sherrod*, 445 F.3d 980, 981-82 (7th Cir. 2006). To prevail here, Matuck must

show he could have contested facts relevant to the first prong of the *Maggi* test.

 Matuck's tribal enrollment certificate[2] showed that Matuck was 13/16

Hualapai and 1/8 Havasupai. *See* Appellant Br. Gov't Ex. 1 (Doc. 10-2) at 1,

*United States v. Matuck*, No. 13-30004 (9th Cir. filed June 4, 2013); *compare, e.g.*,

*United States v. Seymour*, 684 Fed. Appx. 662, 663 (9th Cir. 2017) (unpublished

mem. disp.) (holding that certificate showed tribal membership but "says nothing

about Seymour's Indian blood" and so did not meet first prong of test), *cited in*

---

[2]  The parties stipulated to the certificate's admissibility. Matuck claims it was not self-authenticating, *see* Mot. § 2255 at 11, but it did not need to be. The United States could have called a witness to authenticate it but did not because of the stipulation. Matuck does not claim the certificate was not his.

Mot. § 2255 at 9, 12.

The Federal Register established the Hualapai Tribe's federal recognition as of the date of Brown's murder. *See* 75 Fed. Reg. 60810, 60811 (Oct. 1, 2010); *see also* 77 Fed. Reg. 47868, 47870 (Aug. 10, 2012). The certificate proved both that Matuck had Indian blood and that it came from the Hualapai Tribe. Absent a stipulation, the United States would have been required to call a witness to authenticate the certificate and obtain either testimony or a jury instruction regarding the Hualapai tribe's federal recognition. It was not unreasonable for counsel to enter into a stipulation relieving the United States of its burden of proof on the first prong of the *Maggi* test, when no realistic prospect existed that the proof would have failed.

The distinction between Matuck's case and *Zepeda* and *Maggi* is greater than he appears to realize. The defendant in *Zepeda* claimed that a difference existed between "the Tohono O'Odham Nation *of Arizona*," which was recognized by the government of the United States, and the "Tohono O'Odham" bloodline listed on his tribal enrollment certificate. He averred that "a substantial portion" of people of Tohono O'Odham blood had "always resided in the Sonoran Desert *of northwest Mexico*." *Zepeda*, 738 F.3d 201, 212 (9th Cir. 2013) (quoting defendant's brief) (emphases added). In other words, Zepeda's bloodline could have come from a tribe in Mexico, not the tribe in Arizona recognized by the

United States.

Defendant Mann's tribal enrollment certificate in *Maggi* showed that he was 10/64 Chippewa and 11/64 other Indian blood. *See Maggi*, 598 F.3d at 1080. A blood quantum of 10/64 Chippewa could have supported Indian status. Mann descended from the Little Shell Tribe of the Chippewa Cree, however, which has not been federally recognized, rather than from the federally recognized Chippewa Cree Indians of the Rocky Boy's Reservation. *See id.* at 1076.

In both *Zepeda* and *Maggi*, some evidence suggested that the defendant's bloodline did not come from a federally recognized tribe. This issue forced the Ninth Circuit to decide whether the United States must prove that the defendant's bloodline came from a federally recognized tribe. Eventually, the en banc court decided federal recognition need not be proved under the first prong of the "Indian person" test. *See Zepeda*, 792 F.3d at 1107. This issue never mattered to Matuck's case. He pointed to no group of Hualapai people who are not connected to the "Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona." He also has failed to claim that his bloodline originates with the group that is not federally recognized.

The United States would have been able to prove Matuck was an Indian person even under the more demanding *Maggi* test. Counsel did not provide ineffective assistance of counsel when he stipulated to Matuck's Indian status.

This claim is denied.

## B. Ineffective Assistance of Trial Counsel

Matuck criticizes many aspects of his trial attorneys' performance. These allegations have been reorganized here.

### 1. Summary of Trial Testimony

John Whiteman and the victim, Raymond Brown, were cousins and longtime friends. On the night of the murder, Matuck, Whiteman, and Brown were together drinking, driving around, and visiting various people. At some point, Whiteman and Matuck became irritated with Lance Adams. Adams had been teasing them about consuming other people's alcohol without paying for any themselves.

Three witnesses testified that Matuck made an attempt to grab Adams by the throat. Two of these witnesses stated that Matuck had said "something about . . . killing people in the Marines in Iraq." *See* 1 Trial Tr. (Doc. 125) at 88:16-20 (Whiteman); 3 Trial Tr. (Doc. 127) at 282:8-283:14 (Vondall), 291:18-293:1 (Adams). Adams testified on cross-examination that Whiteman had encouraged Matuck to "get him," meaning Adams. *See* 3 Trial Tr. at 293:15-294:15.

At another point, Markie Vondall got into the back seat of the vehicle with Brown, who had fallen asleep. The car was stopped. Vondall did something that woke Brown suddenly, and he shoved or struck her. Matuck confronted Brown. Vondall testified that Matuck referred then to having been "a Marine." *See* 3 Trial

Tr. at 286:16-287:3.

Brown hit Matuck two or three times in the face, drawing blood. The fight broke off, but Launa Swanson testified that Matuck pointed at Brown and said "I'm going to get you." *See id.* at 255:14-256:8, 269:10-270:5. Matuck's nose was bloody for the rest of the night. He used his black t-shirt, imprinted on the front with the name of a band, "As I Lay Dying," to wipe his nose.

Matuck, Brown, Whiteman, and Swanson all went to Whiteman's trailer to listen to music. Swanson passed out. Whiteman testified that he and Brown were singing, but both decided to go to sleep. Brown was sitting in a recliner. Whiteman testified it was nearly dawn.

Yvette White Hawk looked out her window around 8:00 a.m. because her dog was barking. She saw a man walking around the neighborhood. Her son, Gabe Garfield, also looked. He testified that he saw Matuck, whom he knew, stop, look around, and then reach into his shorts to pull out a long strip of grey fabric. When exhibited at trial, the fabric appeared to have been torn from a t-shirt. Garfield watched Matuck go to the corner of a neighboring house, Carol Marculieff's, and place the strip of fabric under a brick in a drainage gutter.

Matuck walked around the corner of the house. He encountered Marculieff on the back porch and asked her for Kool-Aid. Marculieff had no Kool-Aid, and Matuck left. Leon Marculieff called Matuck over to the nearby home of Margaret

"Mugsy" Loves Him.  Matuck drank there for about an hour where he was rude and confrontational.  Loves Him pushed Matuck out the door.

Matuck returned to Whiteman's trailer.  Whiteman and Swanson had awakened and noticed that Matuck was gone.  When he entered the trailer, they asked Matuck where he had been.  Matuck said he had been "upstairs." *See* 1 Trial Tr. at 100:1-9 (Whiteman), 259:5-17 (Swanson).  Whiteman's trailer had only one level.

Whiteman and Swanson decided to leave.  They were unable to wake Brown, who was still sitting in the recliner.  They realized Brown's tongue was protruding from his mouth, his body was cold, and they could not detect a heartbeat.  They called 911.

News that Brown was dead spread quickly through the neighborhood.  People gathered outside Whiteman's trailer.  Although Matuck was standing with Whiteman and comforting him when police arrived, the crowd soon turned on Matuck.  Brown's uncle and twin brother confronted him and asked, "Did you do that to my nephew?"  *See* 1 Trial Tr. at 111:9-22 (Whiteman).  Officer Dale, concerned for Matuck's safety, escorted him to a police vehicle.  When Brown's family members tried to open the vehicle doors to get at Matuck, Dale drove Matuck to the tribal jail for his protection.  Matuck had no access to additional alcohol after about 11:00 a.m.

FBI Agent Overby interviewed Matuck at about 5:00 p.m.  Matuck provided a generally detailed statement that proved consistent with statements given a few hours later by Whiteman and Swanson.  Matuck said nothing about having left Whiteman's trailer and wandering around the neighborhood in the morning before Whiteman and Swanson awoke.

Overby asked Matuck what he was wearing the night before.  Matuck said he had been wearing a black t-shirt, but had taken it off and put on a grey shirt (not torn) that he had found in Whiteman's trailer.  Matuck explained that he had used the black shirt to wipe his nose, which had been bleeding all night.  Matuck did not remember how his nose had been bloodied.

Neither Overby nor the detention officer thought Matuck was drunk.  A breath test administered after the interview, at 6:30 p.m., indicated, however, a blood-alcohol concentration of 0.175.  A forensic chemist extrapolated that level back to arrive at a range of 0.269 to 0.242 at 2:00 p.m. and a range of 0.362 to 0.310 at 11:00 a.m.

Meanwhile, Gabe Garfield retrieved the strip of grey t-shirt-type fabric that he had seen Matuck hide in the drainage gutter.  Garfield took the fabric into his house where he dropped it on the floor.  White Hawk put the fabric in a plastic bag and turned it over to police.  Visible dark red stains on the fabric proved to be Matuck's blood.  An analyst found several other DNA profiles on the fabric.

These profiles could have come from Whiteman and/or Brown (or presumably his twin brother), or from one-in-510 to one-in-140 randomly selected Native Americans.

An FBI analyst found fibers from the carpet behind the recliner on the shirt and shorts that Matuck had been wearing when he was taken into protective custody. The analyst found more fibers on the recliner, and on the strip of fabric that Matuck had hidden under a brick at a nearby home.

Whiteman was the major contributor to DNA found in the fabric at the top rear of the recliner. Swanson and Brown did not contribute any of that DNA. Matuck could have been a minor contributor, but so could one-in-five to one-in-three randomly selected Native Americans.

A pathologist testified that Brown had been strangled with a soft ligature for at least 30 seconds. Asked to examine the strip of grey t-shirt fabric Matuck had concealed under the brick, the doctor found "[t]he texture of this cloth is perfect" and, as a ligature, it "would be sufficient" to have strangled Brown.

### 2. Matuck's Allegations

### g. Pretrial Investigation

Matuck argues that counsel should have investigated Wes Grey Bull and Raymond Leggitt. *See* Mot. § 2255 at 5 ¶ 5C(i), 21 para. 2, 21 para. 2.

Whiteman's first contact with Matuck on the evening in question occurred at

Grey Bull's house, where several people had gathered to watch a UFC fight on pay-per-view. *See* 1 Trial Tr. at 77:20-78:25. Grey Bull has children with the sister of Gabe Garfield, who later saw Matuck hiding the strip of fabric. Matuck says he "did not know Gabe Garfield and Wes Grey Bull had family ties." Matuck contends that "[t]hese facts could have had an effect on Matuck's case, if raised by trial attorneys," Mot. § 2255 at 21 para 2.

The Court gave Matuck an opportunity to explain what effect knowledge of a family relationship between Grey Bull and Garfield would have had. In response, Matuck stands on the allegations in his motion. *See* Resp. to Order (Doc. 149) at 1.

Many people in Poplar know each other and are related to each other. None of the trial witnesses suggested Grey Bull was present or involved in anything that occurred after Whiteman, Brown, and Matuck left his house. In Matuck's motion for new trial, counsel Hoovestal proffered that Grey Bull was at Whiteman's home when Brown died, but Hoovestal explained that Matuck did not tell trial counsel. Hoovestal only heard the allegation three months after trial. *See* Br. in Supp. of Mot. for New Trial (Doc. 113) at 2-4.

At sentencing, Matuck said that he "did notify Vann [Arvanetes] that he might need to investigate Wes Graybull." Sentencing Tr. (Doc. 132) at 10:19-22. Matuck never told Arvanetes why investigator Graybull might be worthwhile.

Nothing that Matuck alleges in his § 2255 motion, or in his response to the order, supports an inference that trial counsel unreasonably failed to investigate Grey Bull's whereabouts at the time of the murder.

The trial transcript contains no mention of Leggitt. Matuck does not say who Leggitt is or what relevant information Leggitt might possess, or what information about Leggitt might be relevant to Matuck's petition.

Matuck's allegations fail to support an inference that trial counsel unreasonably failed to investigate either Grey Bull or Leggitt or that Matuck suffered prejudice as a result.

### b. Motion to Suppress

Matuck contends that "[t]rial attorneys could have stated that Matuck requested an attorney during the FBI interview." Matuck further contends that his trial counsel should have argued that he had been "legally intoxicated and Agent Overby ignored his rights." Mot. § 2255 at 23 para. 2.

Counsel filed a motion to suppress Matuck's statements to the FBI as involuntary due to his intoxication. *See* Mot. to Suppress & Br. in Supp. (Docs. 34, 35); Mot. Hr'g Tr. (Doc. 130) at 6:9-49:4. Counsel did not argue that Matuck asked for a lawyer. A witness would have had to testify that Matuck asked for a lawyer. Matuck makes no claim that he actually asked for a lawyer. He argues instead that counsel should have claimed that he had asked.

Officer Dale testified at trial that Matuck asked to talk to a lawyer when he entered the jail around 11:45 a.m. *See* 3 Trial Tr. at 308:15-309:4. Matuck was not interrogated at that time. He was not entitled to see a lawyer at that time.

Matuck has failed to meet either prong of the *Strickland* test.

### c. Voir Dire

Matuck claims that a tribal investigator made a statement to the newspaper and that newspaper articles "were published as if Matuck were charged and guilty." Mot. § 2255 at 20 para. 6, 21 para. 1. Four jurors, Sather, Spotts, Miranda, and Ross, said they had heard or read media coverage or community gossip about the case, but would consider only the evidence presented in court. 2 Trial Tr. (Doc. 126) at 44:14-47:2 (under seal); *see also id*. at 59:21-60:8. None of these four wound up on the jury. *See id*. at 83:7-21. This portion of Matuck's claim fails to meet either prong of the *Strickland* test.

Matuck also alleges that a juror had the last name of Brown, the same as the victim. *See* Mot. § 2255 at 23 para. 1. The Court addresses this claim in a separate order.

### d. Allegedly Unprofessional Conduct

Matuck claims one of his lawyers gave him an "unprofessional" fist bump during trial and another "had his head down and was not paying attention during Matuck's trial." Matuck also complains that when he asked counsel a question

about certain evidence or a witness statement, he would receive additional

discovery addressing his question about a week later.  *See* Mot. § 2255 at 22 paras.

2-3.

 Counsel must investigate information provided by a client to determine

whether the information proves relevant to the client's defense.  When, like

Matuck, a defendant has two lawyers, one can focus on upcoming issues while the

other listens to testimony.  The fist bump was not unprofessional; it is the kind of

thing that can humanize a client for the jury.  No claim for relief is available on

these facts.

Matuck says counsel "had [him] wearing jail-issued slippers during trial,

which is like wearing jail-issued handcuffs."  Mot. § 2255 at 22 para. 4.  Unlike

handcuffs or shackles, slippers do not connote dangerousness.  A reasonable

person would recognize they may serve purposes other than restraint, such as

ameliorating the pain of an ingrown toenail.  Reasonable jurors would not have

been influenced by Matuck's jail-issue slippers.

### e.  Exhibit 11

Matuck says the "initial report" of analysis of Exhibit 11, the grey strip of

fabric, "had inconclusive DNA as to Raymond Brown."  Mot. § 2255 at 19 para. 2.

The report shows that testing excluded Brown as a contributor of DNA found in

one location on the fabric.  The same testing included Brown as a potential

contributor to DNA found in another location on the fabric.  *See* FBI Report (Doc. 56-1) at 3-4 (concerning Q58-1 and Q58-15).  Nothing contradictory arises from these differing test results.  It seems reasonable that some of the blood on the fabric belonged to Brown and some did not.

### f.  Prior Inconsistent Statements

Matuck argues that counsel should have pointed out that witnesses' statements conflicted with each other, some witnesses' pretrial statements differed from their trial testimony, and the timeline of events changed.  *See* Mot. § 2255 at 5 ¶ C(i), 17 para. 2, 18 para. 2, 20 para. 2.  These scenarios often arise as trial. Juries decide whether the conflicts matter, what they mean, and which statements are worthy of belief.

Matuck says Whiteman's "initial statement was that he did not know what happened," but at trial, "he has a different version of what he claims happened." Mot. § 2255 at 18 para. 2.  Under the circumstances, it seems likely Whiteman said he did not know how Brown died.  He did not testify at trial as to how Brown died. No inconsistency appears.  At any rate, no one would have been surprised to find discrepancies between Whiteman's pretrial statements and his trial testimony.  His memory of the night in question was spotty, and his testimony was somewhat rambling.  Matuck's counsel reminded the jury of these discrepancies.  *See, e.g.*, 4 Trial Tr. at 577:10-578:5.

Matuck alleges that Swanson also made inconsistent statements. Swanson remembered Matuck "grabbed Lance or something like that," but did not testify that Matuck tried to choke him or said anything about having been in the Marines. 3 Trial Tr. at 252:12-254:8; *see* Mot. § 2255 at 17 para. 4. The prior statement, in which Matuck claims that Swanson grabbed Lance seems more incriminating. Most competent lawyers would want to highlight these statements. Matuck suffered no prejudice from its omission.

Matuck also claims that Swanson "immediately claimed Raymond Brown was murdered" and counsel should have asked her to explain how she knew that fact. *See* Mot. § 2255 at 17 para. 3. Swanson did not make that claim during her testimony at trial. To whatever extent she made it in a pretrial statement, again, that statement was at least potentially more incriminating than her trial testimony and so counsel declined to raise the issue.

### g. Fight Between Matuck and Brown

Matuck faults investigators for not collecting evidence to prove or disprove that Matuck and Brown fought with each other inside or outside the car. He also claims that, if a fight occurred, his DNA should have been found on Brown's clothes or body. The DNA testing found none. *See* Mot. § 2255 at 18 para. 3, 19 para. 1, 20 para. 4.

No witness testified that the fight did not occur. The fight explained

Matuck's bloody nose.  Whether it happened inside or outside the car proved

irrelevant to any contested issue.  Even assuming a DNA transfer occurs every time

skin or blood contacts other clothing or skin, that does not mean trace DNA

evidence would be found every time a transfer occurs.  And even if trace DNA

evidence had been found on Brown's body or clothing, that evidence would not

prove whether a fight had taken place.

### h.  Marine Corps Training

Matuck contends that counsel should have asked Lt. Col. Shusko whether he

personally trained Matuck in the use of the garrote technique.  Matuck also claims

that he "missed two days of recruit training to retake the written test while in boot

camp" and "did not receive training on this technique."  Mot. § 2255 at 23 para. 4.

The government presented evidence that Matuck had received the Tan Belt

Manual.  *See* Notice (Doc. 27) at 6-7; Exhibit List (Doc. 94) (Ex. 17); 2 Trial Tr.

(Doc. 127) at 172:9-173:1.  The Tan Belt Manual included instruction and

information about garroting.  *See* 2 Trial Tr. at 175:4-176:10.  It is not reasonably

probable that Matuck would have been acquitted if his counsel had presented

evidence that he had missed the training.

### i.  Identification of Matuck

Matuck suggests that counsel should have argued the witnesses did not

identify him in person, but only from a photograph.  *See* Mot. § 2255 at 21 para. 3.

Matuck sported a shaved head at the time of the murder. *See* 3 Trial Tr. at 326:16-19. Matuck had grown out his hair at the time of trial. *See, e.g.*, Presentence Report at 2 (photograph of defendant).

### j. Premeditation

Matuck argues that there was "no premeditation because the statements are inconsistent throughout the investigation." Mot. § 2255 at 20 para. 3. This claim fails to support Matuck's theory. The 30 seconds that it took to kill Brown could have provided sufficient evidence of premeditation.

### k. The Recliner

Matuck argues that blood would have been found on the recliner if Brown had hit him and given him a nosebleed that lasted for hours. Mot. § 2255 at 18 para. 3. Matuck told Agent Overby that his nose had been bleeding all night. Whiteman and Swanson said the same thing. The jury knew that none of Matuck's blood had been found on the recliner. The jury considered whether the absence of Matuck's blood on the recliner meant he was not near the recliner. The jury rejected Matuck's argument that he had not been near the recliner.

### l. Allegedly Omitted Facts

Finally, Matuck claims that counsel did not point out the following items. They did.

Investigators found no footprints in the dust behind Brown's recliner. *See*

Mot. § 2255 at 5 ¶ C(i), 18 para. 3, 19 para. 4; 4 Trial Tr. (Doc. 128) at 580:20-
581:4.

Brown had taken methamphetamine and had "been up" for "a few days."
*See* Mot. § 2255 at 19 para. 5, 20 para 1; 1 Trial Tr. at 114:15-115:8, 123:11-20; 4
Trial Tr. at 579:7-9.   It is not immediately apparent whether the alleged presence
of needles in Brown's pocket would have made any difference in the outcome.

Brown assaulted Vondall and Matuck defended her.  *See* Mot. § 2255 at 17
para. 5-6, 18 para. 1; 4 Trial Tr. at 579:17-580:2, 585:23-586:6.

Investigators never found the t-shirt from which, according to the
government's theory, the garrote had been fashioned.  *See* Mot. § 2255 at 19 para.
3; 4 Trial Tr. at 453:1-11, 498:7-500:7, 580:10-11, 583:17-25.

Brown was taller and heavier than Matuck.  *See* Mot. § 2255 at 23 para. 3; 3
Trial Tr. at 405:23-406:4.

Although Matuck was wearing shorts and the strangler probably used his
knee for leverage, no one tested the back of the recliner for DNA.  *See* Mot. § 2255
at 18 para. 3; 4 Trial Tr. at 586:15-587:24.

Matuck was wearing the grey shirt and shorts while he was in Whiteman's
trailer.  The grey shirt belonged to Whiteman.  Fibers from the carpet behind the
recliner could have been transferred to Matuck's shirt and shorts and then to the
recliner.  *See* Mot. § 2255 at 20 para. 5; 3 Trial Tr. at 433:18-434:6; 4 Trial Tr. at

24

587:8-20.

Finally, although Matuck asserts that counsel "did not argue that a thorough investigation was not conducted," Mot. § 2255 at 18 para. 3, that was a central component of the defense theory at trial. *See, e.g.*, 1 Trial Tr. at 61:9-13, 66:17-22; 4 Trial Tr. at 575:4-12, 583:6-25, 584:7-19, 586:15-24, 587:22-588:5, 591:2-15, 593:5-8. Specifically, Matuck's counsel focused on the absence of an eyewitness. *See* Mot. § 2255 at 21 para. 4, 22 para. 1; 1 Trial Tr. at 59:22; 4 Trial Tr. at 575:10-12.

### m.  Conclusion

None of Matuck's allegations supports both an inference that counsel's performance may have been unreasonable and an inference that there exists a reasonable probability the outcome might have been different. All claims concerning counsel's performance at trial are denied.

### D.  Matters in Fort Peck Tribal Court

Matuck contends that he was detained on the authority of the Fort Peck Tribal Court for about a year that his tribal counsel had a conflict of interest, and that he was treated less favorably than similarly situated inmates who were tribal members. He also claims that the Fort Peck Police Department continued his detention despite a release order from the Tribal Court, to punish him for murder without charge or an opportunity to defend himself. *See* Mot. § 2255 at 25-31.

Even assuming these allegations are true, they do not undermine the validity of Matuck's conviction or sentence in federal court. Other than Agent Overby's interview on August 7, 2011, when Matuck was initially taken into protective custody, the United States did not use against Matuck any statement he might have made in tribal court or while in tribal detention. Voir dire revealed no reason to believe seated or potential jurors were unfairly biased against him. No reason exists to infer that Matuck's allegedly unlawful detention caused or contributed to his federal conviction or sentence.

Matuck asserts that his time in tribal custody "is not included in Matuck's prison sentence" and "[h]ad that time been added to Matuck's federal prison sentence, Matuck would have no argument." Mot. § 2255 at 30, 31. The Court sentenced Matuck to a mandatory term of life in prison. *See* Judgment (Doc. 116) at 2; 18 U.S.C. § 1111(b)(1). No parole exists for a federal offense. No claim is available under these circumstances.

This claim is denied.

### E.  Ineffective Assistance of Appellate Counsel

Though framed as ineffective assistance of appellate counsel, Matuck directs these claims at the counsel who represented him after trial, through sentencing and appeal. The standards of *Strickland* govern claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

### 1.  Dismissal of Second Indictment

Matuck contends that counsel denied him "the right to a fair trial" by agreeing to the United States's motion to dismiss a second indictment against him that charged aggravated sexual abuse, sexual abuse, and abusive sexual contact. *See* Mot. § 2255 at 4, 14-15; *see also* Indictment (Doc. 1), *United States v. Matuck*, No. CR 12-58-GF-SEH (D. Mont. Aug. 1, 2012).  A defendant suffers no prejudice by dismissal of criminal charges against him.  This claim is denied.

### 2.  Rehearing

Matuck claims counsel caused him to miss the deadline for filing a petition for rehearing on appeal.  Matuck identifies no potentially valid point that he was unable to raise.  *See* Fed. R. App. P. 35(a), 40(a)(2).  This claim is denied.

### 3.  Trial Counsel

Matuck also alleges that appellate counsel failed to raise trial counsel's allegedly ineffective assistance as grounds for relief on appeal.  Matuck has identified only one potentially valid claim regarding voir dire.  This claim could not have been raised on direct appeal as it requires an investigation of the relevant facts.  *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 505 (2003).  This claim is denied.

Accordingly, IT IS HEREBY ORDERED that, except for Matuck's claim alleging that trial counsel provided ineffective assistance in voir dire, all claims are

DENIED for lack of merit.  They will not be further considered.

DATED this 17th day of April, 2018.


_____

Brian Morris
United States District Court Judge